RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0363p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES EX REL. THOMAS M. SCHELL,
       *Plaintiff-Appellant,*

  *v.*

BATTLE CREEK HEALTH SYSTEM, a Michigan non-profit corporation,

       *Defendant-Appellee.*

No. 04-1418

>

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 00-00143—Robert Holmes Bell, Chief District Judge.

Argued: May 31, 2005

Decided and Filed: August 22, 2005

Before: MOORE and COOK, Circuit Judges; GWIN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Mark W. Hafeli, BEIER HOWLETT P.C., Bloomfield Hills, Michigan, for Appellant. Alan G. Gilchrist, FOSTER, SWIFT, COLLINS & SMITH, Farmington Hills, Michigan, for Appellee. **ON BRIEF:** Mark W. Hafeli, BEIER HOWLETT P.C., Bloomfield Hills, Michigan, for Appellant. Alan G. Gilchrist, FOSTER, SWIFT, COLLINS & SMITH, Farmington Hills, Michigan, for Appellee.

 MOORE, J., delivered the opinion of the court, in which GWIN, D. J., joined. COOK, J. (pp. 8-9), delivered a separate dissenting opinion.

---

## OPINION

---

 KAREN NELSON MOORE, Circuit Judge. Relator Thomas Schell ("Schell") appeals from the district court's entry of summary judgment in favor of Defendant-Appellee Battle Creek Health System ("Battle Creek") in the underlying False Claims Act ("FCA") *qui tam* suit. Schell's central allegation is that Battle Creek violated the FCA, 31 U.S.C. §§ 3729-3733, by charging Medicare for

---

 [*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

entire multi-dose vials of anesthetic medication when less than the full vial of medication was administered to a patient. The district court below concluded that Battle Creek was entitled to summary judgment because Schell failed to demonstrate that Battle Creek's billing methodology resulted in increased payments by Medicare. For the reasons set forth below, we **REVERSE** the district court's entry of summary judgment in favor of Battle Creek and **REMAND** for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

From 1991 to 1999, Schell was employed by Battle Creek as a certified registered nurse/anesthetist ("CRNA"). Battle Creek terminated Schell's employment in May 1999 as part of a plan to replace CRNAs with independent contractors. In March 2000, Schell filed the instant FCA *qui tam* suit against Battle Creek and its owner, Mercy Health Services. In his complaint, Schell alleges that, during his period of employment, Battle Creek committed fraud by charging Medicare for entire multi-dose vials of anesthesia medication when only portions of the vials' contents were administered to patients:

> During Mr. Schell's employment with Defendant, as well as before and after his employment, the Defendant had been ordering "multi-dose" vials of medication, administering a small portion of the medication in each vial to an individual patient, and then charging the patient for the entire cost of the vial. . . . The opened multi-dose vial would then be kept, and additional portions of medication in it would be used for additional patients, charging each patient for the full cost of a vial. This was done for all patients at the hospital from 1991 through 1999.

Joint Appendix ("J.A.") at 49-50 (Second Am. Compl. ¶¶ 12-13). The United States was served with Schell's complaint but elected not to intervene. After a series of motions, the district court twice granted Schell leave to file an amended complaint and ordered the dismissal of all claims against Mercy Health Services.

A Rule 16 status conference was held with a magistrate judge in October 2002, and shortly thereafter a case-management order requiring Battle Creek to produce documents relating to its billing of anesthesia medications was entered. A second Rule 16 status conference was held in January 2003, and the magistrate judge ruled that because Schell's allegations of fraud primarily arose out of Battle Creek's adherence to a policy of charging Medicare for entire multi-dose vials of anesthesia medication, discovery should focus, at least initially, on the question of whether such a billing practice would in fact result in increased Medicare payments to Battle Creek. Both Schell and Battle Creek commissioned expert-witness reports addressing the impact of Battle Creek's practice of billing for entire multi-dose vials of anesthesia medication on payments made by Medicare. J.A. at 519-24 (expert-witness report and affidavit prepared by Robert R. Zielesch on behalf of Battle Creek); J.A. at 525-32 (expert-witness report and affidavit prepared by Lawrence Bara on behalf of Battle Creek); J.A. at 533-77 (expert-witness report and affidavit prepared by Jack Ahern on behalf of Schell); J.A. at 895-97 (expert-witness report prepared by Andrei M. Costantino on behalf of Battle Creek).

After the experts completed their reports and were deposed, Battle Creek moved for summary judgment on the grounds that Battle Creek's policy of charging for entire multi-dose vials did not result in increased expenditures by Medicare because Medicare reimbursements for

outpatients were calculated on a cost (not charge) basis.  The district court granted Battle Creek's motion and ordered the dismissal of Schell's suit.  Schell now appeals.[1]

## II.  ANALYSIS

### A.  Standard of Review

We review de novo the district court's grant of summary judgment in favor of Battle Creek. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 597 (6th Cir. 2003).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  In considering Battle Creek's motion for summary judgment, we view the evidence in the light most favorable to Schell, the nonmoving party. *Himmel*, 342 F.3d at 598 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B.  Liability Under the False Claims Act

Liability under the FCA attaches "when (1) a person presents a claim for payment or approval or to decrease an obligation owed to the Government; (2) the claim is false or fraudulent; and (3) the person acted knowingly, defined as actual knowledge of the information, or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 451 (6th Cir. 2005) (citing 31 U.S.C. § 3729(b)); *see* 31 U.S.C. § 3729(a) (establishing that a person is subject to liability under the FCA when he or she, *inter alia*, "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . .or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government").  However, we have cautioned that:

> liability does not arise merely because a false statement is included within a claim, but rather the claim itself must be false or fraudulent.  A false statement within a claim can only serve to make the entire claim itself fraudulent if that statement is material to the request or demand for money or property.

*Medshares*, 400 F.3d at 443.

---

[1] Relator Thomas Schell ("Schell") initially alleged that Defendant-Appellee Battle Creek Health System ("Battle Creek") engaged in fraudulent billing practices with respect to three classes of patients:  inpatients, inpatient "outliers" (i.e., inpatients whose treatment expenses greatly exceeded the normal lump sum paid to health care providers based on an inpatient's diagnosis), and outpatients.  Joint Appendix ("J.A.") at 403-06 (D. Ct. Summ. J. Op. at 9-11).  The district court granted summary judgment to Battle Creek with respect to all three classes of patients.  Schell, however, appeals the district court's order only with respect to outpatients. *See* Pl.-Appellant's Br. at 6 ("The Government's appeal is limited to Judge Bell's ruling as it applies to outpatients of Appellee, Battle Creek Health System.  The Government is not appealing Judge Bell's ruling as to inpatients of the Hospital.").

## C. Medicare Outpatient Reimbursement System

Based on our review of the parties' expert-witness reports, it appears that the parties are in agreement as to the general Medicare-reimbursement procedures at issue in this case. Under the Medicare program, Battle Creek received reimbursements for covered outpatients' expenses in two phases. First, after a patient had been treated, Battle Creek would submit a claim for reimbursement to Medicare, and shortly thereafter Medicare would issue an interim payment to Battle Creek. During the years at issue in this suit, Medicare reimbursed providers for outpatient expenses based on the provider's "reasonable cost" in furnishing such care.[2] Because the amount Battle Creek *charged* for a service differed from the actual *cost* incurred by the Battle Creek in providing such a service, calculating the interim-payment amount required use of a "cost-to-charge ratio" that would convert Battle Creek's charges into cost figures. Cost-to-charge ratios are determined based on the total charges and costs for an entire year, and thus Battle Creek's cost-to-charge ratio for any given year was unknown until the year was complete. Hence, in calculating the interim payment due from Medicare, Battle Creek used the prior calendar year's cost-to-charge ratio to estimate its cost in treating a particular Medicare outpatient.

During the second phase, which could take years to complete,[3] the fiscal intermediary acting on behalf of Medicare would review Battle Creek's annual cost report and determine Battle Creek's final cost-to-charge ratio for that year. Because the interim payments previously paid to Battle Creek had been calculated based on the prior year's cost-to-charge ratio, the interim payments received by Battle Creek could reflect an overpayment or underpayment by Medicare. If Battle Creek received interim payments exceeding the total reimbursement amount for the year, Battle Creek would remit the excess to the U.S. government. Conversely, if the interim payments received by Battle Creek were less than the total amount Battle Creek was owed for the year, Medicare would pay any outstanding balance.[4]

---

[2] In 2000, the Department of Health and Human Services replaced Medicare's cost-based payment system for outpatients with a prospective-payment system in which providers receive a lump-sum payment based on a patient's diagnosis. *See* Office of Inspector General; Medicare Program; Prospective Payment System for Hospital Outpatient Services, 65 Fed. Reg. 18,434, 18,434, 18,436-38 (Apr. 7, 2000) (providing overview of current outpatient prospective-payment system and former cost-based payment system and noting that prospective-payment system had been used with respect to inpatients since the 1980s); *see also* J.A. at 535 (Ahern Report at 2) (describing differences between cost-based outpatient reimbursement system and diagnosis-based prospective payment system for inpatients).

[3] According to Battle Creek expert witness Robert Zielesch ("Zielesch"), final settlement of Battle Creek's cost reports often took two years or longer. *See* J.A. at 520 (Zielesch Report at 2) (indicating notice of program reimbursement ("NPR") date of May 13, 1997 for 1991 cost report; NPR date of July 5, 2000 for 1992 cost report; NPR date of June 30, 2000 for 1993 cost report; NPR date of September 30, 1996 for 1994 report; NPR date of September 30, 1997 for 1995 cost report; NPR date of September 18, 1998 for 1996 cost report; NPR date of July 6, 2000 for 1997 cost report; NPR date of May 31, 2001 for 1998 cost report; and NPR date of September 29, 2001 for 1999 cost report).

[4] According to Schell's expert witness, Jack Ahern, Battle Creek had an outpatient cost-to-charge ratio of approximately 31.22% in 1994, 29.25% in 1995, 31.31% in 1996, 30.07% in 1997, 28.79% in 1998, and 34.21% in 1999. J.A. at 552 (Ahern Report Attachment 1). Ahern's report also indicates that, despite the fact that Battle Creek's cost-to-charge ratio rose in 1996 and 1999, Battle Creek's interim payments for outpatients exceeded the total amount due from Medicare each year between 1994 and 1999. J.A. at 554 (Ahern Report Attachment 3) (indicating that Battle Creek owed repayments to Medicare equaling $900,888 in 1994, $1,232,188 in 1995, $203,082 in 1996, $1,907,055 in 1997, $1,656,842 in 1998, and $2,219,358 in 1999).

## D.  Battle Creek Method of Billing Anesthesia Medications

While the parties appear to be in agreement as to the basic Medicare reimbursement procedures at issue in this case, the parties sharply disagree as to the proper characterization of Battle Creek's method for billing anesthesia medications and the impact that these billing procedures had on Medicare's payments to Battle Creek.  Schell contends that, by charging for an entire vial of anesthesia medication when only a portion of the vial had been administered, Battle Creek engaged in fraud by charging Medicare for medication it did not provide.  Pl.-Appellant's Br. at 10-11 ("[W]hat happened at Battle Creek Health System was similar to going to a grocery store and buying a dozen eggs.  When you opened up the carton you found that there was only one egg inside and yet you had been charged for the full dozen.").  Battle Creek, on the other hand, contends that it simply adopted a flat-fee method of charging for anesthesia medications and that it made no representations to Medicare as to the amount of drug administered to a particular patient.

After reviewing the record before us, we conclude that there are genuine issues of material fact regarding Battle Creek's billing practices that prevent entry of summary judgment at this time.  A central assumption pervading the discovery process and the instant summary judgment proceeding has been that Battle Creek followed a consistent and uniform policy in billing anesthesia medications.  *See* Def.-Appellee's Br. at 12 ("Simply stated, there is no deviation whatsoever in charges from one patient to the next or from one time period to the next. . . . The only possible way the charges could impact Medicare reimbursement for outpatient [sic] would be wide variations in charges for the same service."); J.A. at 1283 (Bara Dep. at 41) ("[A]ll of my assumptions and all of my evaluation was based upon the uniform charge structure.").  However, the sample patient-billing records and UB-92 Medicare-reimbursement forms appended to Schell's second amended complaint provide some indication that Battle Creek in fact may not have followed a uniform, flat-fee method of charging for anesthesia medications.  Specifically, the records for several Battle Creek patients suggest that some requests for payment submitted by Battle Creek to Medicare reflected multiple charges for the same anesthesia medication rather than a single flat-fee charge.  *See* J.A. at 128 (Patient B UB-92 form listing pharmacy charge of $535.25); J.A. at 132 (Patient B itemized statement listing total pharmacy charges of $535.25 and including two separate charges for Midazolam 10 mg/10 mL, two separate charges for Propofol 200 mg/20 mL, and a charge for Midazolam 2 mg/2 mL with a quantity listing of two); J.A. at 189 (Patient D itemized statement listing total pharmacy charges of $210.75 and including two separate $12.50 charges for Lidocaine 1% 20 mL); J.A. at 194 (Patient D UB-92 form listing total pharmacy charges of $207.75); J.A. at 254 (Patient E itemized statement listing total pharmacy charges of $311.50 and including two separate charges for Propofol 200 mg/20 mL); J.A. at 256 (Patient E UB-92 form listing pharmacy charge of $311.50); J.A. at 279 (Patient F itemized statement listing total pharmacy charges of $292.00 and including two separate $20.75 charges for Midazolam 2 mg/2 mL, two separate $48.00 charges for Propofol 200 mg/20 mL, and two separate $20.75 charges for Succinylcholine 200 mg/10 mL); J.A. at 283 (Patient F UB-92 form listing total pharmacy charges of $284.50).  Thus, we conclude that there is a genuine issue of material fact with respect to how Battle Creek billed Medicare for anesthesia medications that would make entry of summary judgment in favor of Battle Creek improper at this time.

We note that Battle Creek has argued that summary judgment is proper because any false statements or errors it made with respect to its charges for anesthesia medications are immaterial.  Specifically, Battle Creek has asserted that, because the final amount reimbursed by Medicare is determined based on Battle Creek's costs, any overstated charges would be corrected through the cost-to-charge-ratio adjustment.  We conclude, however, that such an argument lacks merit.

First, as a legal matter, if Battle Creek is found to have made false statements to Medicare during the interim-payment phase, the fact that Battle Creek returned any overpayments to Medicare after final settlement of the cost report would not insulate Battle Creek from FCA liability.  In our

recent *Medshares* decision, we concluded that "false statements or conduct must be material to the false or fraudulent claim to hold a person civilly liable under the FCA," 400 F.3d at 442, and that a false statement is material if it has a "'natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* at 445 (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)) (alteration and internal quotation marks omitted in *Medshares*) (explaining that the natural tendency "standard is more consistent with the plain meaning of the statute, which attaches liability upon *presentment* of a false or fraudulent claim, rather than *actual payment* on that claim"). In applying the "natural tendency" test in *Medshares*, we rejected the home health agency's argument that it should be relieved of civil liability under the FCA because it expected the fiscal intermediary to conduct an audit and to disallow any pension expenses the home health agency had claimed in error. *See id.* at 447 ("A party cannot file a knowingly false claim on the assumption that the fiscal intermediary will correctly calculate the value in the review process. Such a result would shift the burden of cost calculation from the provider to the fiscal intermediary and encourage the filing of false claims, which is directly at odds with the stated goal of the FCA.") (citation omitted). Applying *Medshares* to the case at bar, we conclude that if Battle Creek made false statements to Medicare during the interim-payment phase, Battle Creek would not be immune from FCA liability simply because it reimbursed Medicare for any overpayments after final settlement of the cost report.

Second, as a technical matter, Battle Creek's reliance on the cost-to-charge ratio as an accurate conversion mechanism is called into question to the extent that the evidence before us suggests that Battle Creek may not have followed a uniform procedure in how it charged its patients. As Lawrence Bara, one of Battle Creek's expert witnesses, explained, the conclusion that charging for entire multi-dose vials of anesthesia medication does not cause increased costs to Medicare hinges upon Battle Creek's charging each of its patients in the same manner. *See* J.A. at 1252 (Bara Dep. at 10) ("[C]harges are nothing more than a statistic on the Medicare cost report. They do not — as long as it's a uniform charge structure — and that's what primarily the auditors are concerned with is that it's a uniform charge structure."); J.A. at 1295 (Bara Dep. at 53) ("If it's a uniform charge structure, everybody is getting charged that same amount, so therefore it's in the cost-to-charge ratio."); J.A. at 1296 (Bara Dep. at 54) ("As far as if there's not a uniform charge structure, it affects the cost-to-charge ratio. And if you were an intermediary auditor, you would take a look at that and at a minimum gross up those charges so that everybody had a uniform charge structure for the cost report."). Because the patient-billing records submitted by Schell provide some indication that Battle Creek did not uniformly charge all its patients a flat fee for anesthesia medications, we cannot conclude on the basis of the evidence currently before us that there is no genuine issue as to whether Battle Creek's billing practices resulted in increased costs to Medicare.

## E. Bad Debt Payments

In his brief opposing Battle Creek's motion for summary judgment, Schell asserted that, in addition to increasing payments by Medicare for standard outpatient-reimbursement claims, Battle Creek's allegedly fraudulent billing practices could also result in increased bad-debt payments by Medicare.[5] The district court below rejected Schell's bad-debt claim, explaining that "Schell's expert opinion does not address the issue of bad debt payment and Schell has failed to identify any facts which create a genuine issue of material fact as to this issue." J.A. at 407 (D. Ct. Summ. J. Op. at 13). However, two of Battle Creek's expert witnesses, Lawrence Bara and Robert Zielesch, did discuss bad-debt payments during their depositions, and the financial-analysis portion of the report prepared by Schell's expert witness, Jack Ahern, does indicate that Battle Creek received outpatient

---

[5]Simply put, even though an outpatient may be covered by Medicare, the outpatient still must pay a portion of his or her medical expenses (referred to as a "co-payment"). If the hospital follows certain procedures but is still unable to collect the co-payment from the outpatient, Medicare will reimburse the hospital for a portion of this "bad debt."

bad-debt payments from Medicare in 1996, 1997, 1998, and 1999. J.A. at 563, 566, 569, 572 (Ahern Report Attachments 12, 15, 18, 21). Because the fact questions that exist with respect to Battle Creek's method of charging for anesthesia medications are likely to have some bearing on the question of whether Battle Creek is liable for submitting false claims to Medicare for bad-debt payments, we conclude that the district court should reconsider the issue of bad-debt payments on remand.

## III. CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's order granting summary judgment in favor of Battle Creek and **REMAND** for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

COOK, Circuit Judge, dissenting. Because I conclude that the billing practices challenged here did not cause Medicare to overpay Battle Creek, I respectfully dissent.

As both parties' experts acknowledged, Medicare reimburses Battle Creek based on the hospital's costs, not its charges to patients. (J.A. at 519, 529, 686.) And Medicare audits Battle Creek's cost reports at the end of each year so that, as Battle Creek's expert admitted, "at the end of the day," Medicare will not overpay for patients' anesthetics. (J.A. at 734.)

But Plaintiff Schell contends that Battle Creek violated the FCA despite these audits, because Medicare made excessive interim reimbursement payments to Battle Creek before the audits occurred, essentially giving Battle Creek interest-free loans. This argument fails, however, because Schell offers no evidence that Battle Creek submitted materially false claims to Medicare.

As the majority observes, Medicare based its interim payments to Battle Creek on a "cost-to-charge ratio." This ratio was determined by comparing costs to patient charges in a prior calendar year. Thus, for example, if in Year One Battle Creek's actual costs were 30% of the amount charged to patients, then Medicare would base its interim payments in Year Two on the same ratio.

Under this system, it does not matter to Medicare if hospitals "overcharge" patients for anesthetic. Medicare is understandably indifferent to whether, as here, hospitals charge patients for an entire bottle of anesthetic for each dose administered. All that matters is whether Battle Creek uses the same billing methods from year to year—that is, whether it only increases its charges proportionate to its costs—so the cost-charge ratio remains the same. If it does, then over- or underpayment by Medicare is unlikely. But if, for example, in Year One, Battle Creek charged patients only for the anesthetic they actually consumed, but in Year Two charged patients for an entire bottle for every dose received, then the drastic change in the cost-to-charge ratio *would* cause Medicare to overpay, and Battle Creek might violate the FCA.

Here, however, the record shows that Battle Creek's billing practices remained consistent throughout the relevant time period. Indeed, Schell's complaint alleges that Battle Creek overcharged "all patients" in the same manner "from 1991 through 1999." (J.A. at 50.) And Schell does not challenge Battle Creek's expert's conclusion that the cost-to-charge ratio barely changed through the 1990s and may have even caused Medicare to *underpay* Battle Creek. (J.A. at 1343-1344.)

Schell points to his expert's testimony that Medicare made excessive interim payments from 1994 through 1999 as evidence of government damages. (Schell Br. at 29.) But this expert essentially admitted that he could not conclude, based on the information before him, that Battle Creek had distorted the cost-charge ratio through disproportionate charge increases—that is, that the overpayments were the product of fraud against the government. (J.A. at 769-71.)

Schell also points to Battle Creek's lack of reimbursement payments to Medicare after auditing as evidence of government damages. (Schell Br. at 37.) To the contrary, however, this only emphasizes that Medicare did *not* suffer damages—instead, Medicare underpaid in its interim payments to Battle Creek (when one considers not only anesthetics, but also other costs for which Medicare reimburses Battle Creek), such that Medicare owed Battle Creek money "at the end of the day."

The majority opinion appears to agree with much of this analysis, but nonetheless reverses the district court's grant of summary judgment. In doing so, it relies on an argument Schell has never made: that Battle Creek may not have had consistent billing practices during the relevant time period, because record evidence suggests Battle Creek may have submitted Medicare payment requests reflecting "multiple charges for the same anesthesia medication rather than a single flat-fee charge." But nothing in the record supports the view that this practice, if it occurred, distorted the cost-to-charge ratio. Again, undisputed record evidence shows that the cost-to-charge ratio remained consistent through the years. Thus any alleged excessive charges to patients, including those the majority cites, are immaterial.

Mr. Schell fails to appreciate how the cost-to-charge ratio works, and why it causes no fraud. One can understand his indignant reaction to seeing multiple patients charged for the same bottle of anesthetic—indeed, Battle Creek may have wrongfully overcharged *patients*. The False Claims Act, however, proscribes only the presentation of false claims to the federal government—and Schell presents no evidence that this occurred here.

I therefore would affirm the district court.