**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 2, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,
ex rel. BRIAN E. CONNER, M.D.,
and BRIAN E. CONNER, M.D.,
CHARTERED,

       Plaintiffs–Appellants and
       Cross–Appellees,

v.

SALINA REGIONAL HEALTH
CENTER, INC.,

       Defendant–Appellee and
       Cross–Appellant.

-----------------------------------------------

HEALTHCARE ADMINISTRATION
RESPONSIBILITY PROJECT AND
JUST HEALTH,

       Amicus Curiae in support of
       Plaintiff–Appellants and
       Cross–Appellees.

Nos. 07-3033 and 07-3035

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 01-CV-2269-CM)**

Ronald H. Clark, Arent Fox, Washington, D.C. (Randall A. Brater, Arent Fox, Washington, D.C., and Douglas L. Carter, Kansas City, Missouri, with him on the briefs), for the Plaintiffs–Appellants and Cross–Appellees.

James D. Griffin, Blackwell Sanders Peper Martin, LLP, Kansas City, Missouri (Stephen J. Torline and Lori J. Sellers, Blackwell Sanders Peper Martin, LLP, Kansas City, Missouri; John W. Mize and Peter S. Johnston, Clark, Mize & Linville, Chtd., Salina, Kansas, with him on the briefs), for Defendant–Appellee and Cross–Appellant.

Sharon J. Arkin, Arkin & Glovsky, Lake Forest, California, on the brief for Amicus Curiae.

Before **LUCERO** and **EBEL**, Circuit Judges, and **FRIZZELL**,[*] District Court Judge.

**LUCERO**, Circuit Judge.

Brian E. Conner, M.D., and Brian E. Conner, M.D., Chartered[1] ("Conner") brought this qui tam action on behalf of the United States and against Salina Regional Health Center, Inc. ("SRHC"), alleging, among other things, violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. Conner asserted that SRHC violated the FCA by seeking payment for Medicare services rendered while in violation of a host of Medicare regulations and statutes. His theory of falsity under the FCA is premised on the observation that each time SRHC files an "annual cost report" with the government, it certifies within that report that it has

---

[*] The Honorable Gregory K. Frizzell, United States District Court Judge, Northern District of Oklahoma, sitting by designation.

[1] Brian E. Conner, M.D., Chartered employs Conner and is the professional association through which Conner practices medicine.

complied with Medicare laws and regulations. Conner alleges that SRHC therefore submitted false claims to the government because it was not in total compliance with those laws and regulations. Following a motion by SRHC to dismiss for failure to state a claim, the district court rejected this theory and dismissed Conner's FCA claims.

On appeal, we must decide whether a qui tam plaintiff, proceeding under the FCA, can maintain a cause of action against a Medicare provider based on an allegation that the provider's certification of compliance with Medicare statutes and regulations, contained in the annual cost report, renders all claims submitted for reimbursement by that provider false within the meaning of the FCA. Like the district court, we hold that the FCA cannot be stretched this far, and affirm the dismissal of Conner's FCA claims. We also affirm the dismissal of Conner's related allegation that SRHC submitted false claims by violating the Medicare Anti-kickback statute, 42 U.S.C. § 1320a-7b ("Anti-kickback statute"), for failure to state a violation of the Anti-kickback statute.

On cross-appeal, SRHC challenges the district court's conclusion that several state law claims pursued by Conner were not barred by the Kansas statute of limitations. We agree with SRHC that the district court erred in finding these claims timely filed under Kansas law and in its use of Rule 15 of the Federal Rules of Civil Procedure, and thus remand to the district court for the limited purpose of dismissing Conner's state law claims with prejudice.

**I**

For 18 years, Conner, an opthamologist and eye surgeon, worked as a member of the medical staff at SRHC's facilities in Salina, Kansas. Many of Conner's patients qualified for Medicare or Medicaid, and SRHC is a provider in the Medicare and Medicaid healthcare programs. As a result, SRHC received payments from the government as remuneration for services provided to patients served by these programs.

During the mid-1990s, Conner and SRHC developed a contentious relationship. SRHC administrators challenged Conner's practices in the operating room and his treatment of hospital scrub staff. Conner complained to the hospital that it hired underqualified scrub staff, provided inadequate facilities and equipment, failed to meet required standards of care, and failed to investigate or review complaints concerning quality-of-care issues. In 1995, as the result of a dispute over surgery performed on a particular patient, SRHC suspended Conner's privileges to perform certain ophthalmic procedures at its facilities.

On May 6, 1996, SRHC's Chief Executive Officer sent Conner a letter regarding the circumstances under which the hospital would restore Conner's privileges:

> Many disputes have arisen with you over after-hours staffing for retinal reattachment procedures. If surgical scrub staff assigned to work for you do not meet your needs, you will be responsible for contracting with preferred scrub staff for your procedures.

The letter also explained that the hospital would adopt Conner's recommendation that he work with SRHC's surgery department to provide additional training to the hospital's scrub staff, because staff "with more experience are preferred by you." Conner later refused to sign a "cooperation agreement" that required him to provide his own scrub staff when he was not satisfied with SRHC staff, and the hospital in turn refused to lift his suspension. He continued, however, to perform other types of surgery until early 1997, when SRHC declined to reappoint him to its medical staff.

Upon the hospital's refusal to reappoint him to its medical staff, Conner began litigating a variety of claims against SRHC. He first filed suit in Kansas state court in 1997, unsuccessfully seeking an order enjoining SRHC from denying his application for reappointment. In 1999, Conner sued SRHC in federal district court, alleging violations of 42 U.S.C. § 1983 and asserting claims for breach of contract, tortious interference, and injunctive relief. The court dismissed the § 1983 claim and declined to exercise supplemental jurisdiction over the state law claims. We affirmed the dismissal. See Conner v. Salina Reg'l Health Ctr., Inc., 56 F. App'x 898 (10th Cir. Feb. 12, 2003) (unpublished). Conner refiled the state law claims in a Kansas court in 2000 but voluntarily dismissed this second state case in February 2004.

Conner brought the present qui tam lawsuit on June 1, 2001, alleging violations of the FCA. The United States has declined to intervene. On June 16,

-5-

2004, Conner filed a Third Amended Complaint, which added the state law claims from the lawsuit he voluntarily dismissed in February 2004. He later filed the now-operative Fourth Amended Complaint,[2] which contained the same claims.

Only a few of the nine counts in Conner's complaint are at issue in this appeal. Conner's federal law causes of action allege that SRHC violated two sections of the FCA by presenting false or fraudulent claims for Medicare reimbursement. <u>See</u> 31 U.S.C. § 3729(a)(1) & (2).[3] These counts actually comprise two distinct legal arguments. Conner first claims that SRHC presented false claims because it was in violation of various regulations and statutes establishing Medicare[4] conditions of participation at all times from 1987 until the present day.[5] Conner's complaint describes some of these alleged violations in

---

[2] All further references to the plaintiff's complaint refer to the Fourth Amended Complaint unless otherwise specified.

[3] Although Conner's complaint also alleged violations of § 3729(a)(3) and (7), he does not appeal the district court's dismissal of his claims under these subsections.

[4] Conner's arguments apply equally to Medicare and Medicaid because hospitals participating in Medicaid must meet the standards of participation for Medicare. <u>See</u> 42 C.F.R. § 482.1(a)(5). For simplicity, we use "Medicare" to refer to participation in both programs.

[5] Specifically, Conner asserts that SRHC violated the following statutes and regulations: 42 C.F.R. § 482.1 <u>et seq.</u> (setting forth conditions of participation for hospitals participating in Medicare)**;** 42 U.S.C. § 1395dd (requirements for examination and treatment of emergency medical conditions); § 2000d (prohibition against discrimination in federally assisted programs); § 1320a-7(b)(6)(B) (allowing the Secretary of Health and Human Services to

(continued...)

detail.  Conner next alleges that SRHC presented false claims because it was in violation of the Anti-kickback statute.  He suggests that SRHC violated this statute by asking Conner to provide his own surgical scrub staff if he was unhappy with those employed by the hospital.  In addition to the FCA-related claims, Conner's complaint asserts claims arising under Kansas law, including breach of contract and tortious interference.  He also seeks injunctive relief.

SRHC moved to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6) and, alternatively, for summary judgment under Federal Rule of Civil Procedure 56.  The district court disposed of the case in two orders.  In the first order, it ruled that Conner had failed to state a claim under the FCA for SRHC's alleged failure to comply with Medicare statutes and regulations because the government's payment for services rendered was not conditioned on such compliance.  See United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 459 F. Supp. 2d 1081, 1086-87 (D. Kan. 2006).  It also dismissed his claim under the Anti-kickback statute, concluding that Conner's complaint failed to allege that the hospital had solicited a kickback in return for Medicare referrals.  Id. at 1090.  According to the court, Conner "merely allege[d] a dispute between two healthcare providers about valid and legal ways to provide surgical support,

---

[5](...continued)
exclude from Medicare participation those facilities failing "to meet professionally recognized standards of health care").

which does not affect Medicare payments." Id.

As to the state law claims, the court declined to dismiss those claims as time barred under the applicable Kansas statute of limitations. The court concluded that the claims—which were part of an amended complaint that Conner did not serve until September 21, 2004—were timely because, under Federal Rule of Civil Procedure 15(c), they related back to conduct alleged in the original federal pleading in this case. The amended claims were thus timely, it reasoned, because they commenced as of June 1, 2001, the date Conner filed his first complaint. Id. at 1093-94. In a subsequent order, however, the district court declined to exercise supplemental jurisdiction over the state law claims and dismissed them without prejudice.

Conner now appeals the district court's rulings on his FCA claims, and SRHC cross-appeals the district court's decision that the statute of limitations did not bar Conner's state law claims. We have jurisdiction pursuant to 28 U.S.C. § 1291.

**II**

Relying on Rule 12(b)(6), the district court dismissed Conner's claims under the FCA for failure to state a claim and refused to dismiss the state law claims as time barred under the same Rule 12(b)(6) standard. We review a district court's application of Rule 12(b)(6) de novo. Trentadue v. Integrity Comm'n, 501 F.3d 1215, 1236 (10th Cir. 2007). Dismissal is appropriate only if

-8-

the complaint, viewed in the light most favorable to plaintiff, "lacks 'enough facts to state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)).

**A**

The FCA "covers all fraudulent attempts to cause the government to pay out sums of money." United States ex rel. Boothe v. Sun Healthcare Group, Inc., 496 F.3d 1169, 1172 (10th Cir. 2007) (quotation omitted). Under the qui tam provision of the statute, any individual can sue on behalf of the United States government to recover for the government's payment of fraudulent claims. 31 U.S.C. § 3730(b). Invoking this provision, Conner alleges that SRHC violated two subsections of the FCA, those which create liability for

> [a]ny person who—
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval [or]
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . .

31 U.S.C. § 3729(a)(1)-(2). Although Conner brings separate claims for violations of each subsection, his assertions share a common element that proves fatal to his theory of the case: Connor has not alleged that SRHC submitted a legally fraudulent or false claim, as required by the FCA. See Mikes v. Straus, 274 F.3d 687, 695-96 (2d Cir. 2001) (noting that both § 3729(a)(1) and (a)(2)

-9-

require proof of a false or fraudulent claim).

The FCA recognizes two types of actionable claims—factually false claims and legally false claims. In a run-of-the-mill "factually false" case, proving falsehood is relatively straightforward: A relator must generally show that the government payee has submitted "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Id. at 697. By contrast, in a claim based on an alleged legal falsehood, the relator must demonstrate that the defendant has "certifie[d] compliance with a statute or regulation as a condition to government payment," yet knowingly failed to comply with such statute or regulation. Id. (emphasis added); see also Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 531 (10th Cir. 2000) (allowing § 3729(a)(1) liability to attach under a theory of false certification for invoices submitted for payment where contractor failed to comply with specific requirements within its contract with the government). Conner's claims fall in the latter category.

In this circuit, legally false certification claims can rest one of two theories—express false certification, and implied false certification. Id. An express false certification theory applies when a government payee "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." Mikes, 274 F.3d at 698. This promise may be any false statement that relates to a claim, whether made through

-10-

certifications on invoices or any other express means.  See U.S. ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1172 (9th Cir. 2006) ("So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach.").

Under an implied false certification theory, by contrast, courts do not look to the contractor's actual statements; rather, the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment.  See United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1376 (D.C. Cir. 2000); see also Shaw, 213 F.3d at 531-33.  If a contractor knowingly violates such a condition while attempting to collect remuneration from the government, he may have submitted an impliedly false claim.  See Id., at 531-32.

Conner is adamant on appeal that he proceeds only under a theory of express false certification.  When an the express certification does not state that compliance is a prerequisite to payment, we must look to the underlying statutes to surmise if they make the certification a condition of payment.  See United States v. Southland Mgm't Corp., 288 F.3d 668, 679 (5th Cir. 2002); cf. Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 786 (4th Cir. 1999).  The district court evaluated the underlying Medicare regulations and statutes and concluded that they did not condition payment on the certification of compliance

within the annual cost report. See Conner, 459 F. Supp. 2d at 1086-87. Conner effectively concedes on appeal that the regulations do not contain such a condition, either implicitly or explicitly, but urges us to look to the certification contained in SRHC's annual cost reports. According to Conner, this certification, standing alone, explicitly conditions Medicare payments on compliance with all applicable Medicare statutes and regulations.

To explain why the FCA cannot support such expansive liability in the absence of an underlying statute or regulation that conditions payment on compliance with the certification, we begin with an explanation of how medical providers submit claims for Medicare payment. When a hospital provides a service, it submits individual Medicare reimbursement forms to an intermediary for the government, which calculates and dispenses estimated periodic payments for the services rendered by the provider. See United States ex rel. Schell v. Battle Creek Health Sys., 419 F.3d 535, 539 (6th Cir. 2005). These periodic payments are not considered final payments, however, because the actual monies due to the provider are calculated based on actual costs, which are calculated on an annual basis. See 42 U.S.C. §§ 1395x(v)(1)(A) & 1395f(b). The provider is thus required to submit an annual cost report to the government, which contains comprehensive information on Medicare costs and services provided in the previous year. See In re TLC Hosps., Inc., 224 F.3d 1008, 1011 (9th Cir. 2000). The government's intermediary then audits the expenses noted, relying on the

-12-

revised cost report, and determines whether the government has overpaid or underpaid the provider for the year. Id. at 1011-12; see also 42 C.F.R. § 405.1803(a). After the audit is completed, the intermediary credits or charges the provider for the difference between its estimated and final Medicare reimbursement. 42 C.F.R. § 405.1803(c).

It is within the annual cost report that Conner urges us to find an express false certification. By regulation, the provider's administrator or chief financial officer must make the following certification with each annual cost report:

> I hereby certify that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet Statement of Revenue and Expenses prepared by _____ (Provider Name(s) and Number(s)) for the cost reporting period beginning ___ and ending ___ and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. <u>I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.</u>

42 C.F.R. § 413.24(f)(4)(iv) (emphasis added).

Although this certification represents compliance with underlying laws and regulations, it contains only general sweeping language and does not contain language stating that payment is conditioned on perfect compliance with any particular law or regulation. Nor does any underlying Medicare statute or regulation provide that payment is so conditioned. Thus, by arguing that the

certification's language is adequate to create an express false certification claim, Conner fundamentally contends that any failure by SRHC to comply with any underlying Medicare statute or regulation during the provision of any Medicare-reimbursable service renders this certification false, and the resulting payments fraudulent. Lest there be any doubt about the potential impact of this proposed theory, Conner estimates that the United States has been damaged by SRHC in an amount exceeding $100,000,000 per year in reliance on allegedly false certifications.

"[L]iability [under the FCA] does not arise merely because a false statement is included within a claim, but rather the claim itself must be false or fraudulent." United States ex rel. A+ Homecare, Inc. v. Medshares Mgm't Group, Inc., 400 F.3d 428, 443 (6th Cir. 2005). A false certification is therefore actionable under the FCA only if it leads the government to make a payment which it would not otherwise have made. See, e.g., United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996). Or, put another way, the "false statement must be material to the government's decision to pay out moneys to the claimant." Hendrow, 461 F.3d at 1172; see also United States ex rel. Marcy v. Rowan Cos., 520 F.3d 384, 389 (5th Cir. 2008); Medshares, 400 F.3d at 442-43; United States ex rel. Costner v. United States, 317 F.3d 883, 886-87 (8th Cir. 2003); United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala., 104 F.3d 1453, 1459-60 (4th Cir. 1997). But see United States ex rel. Cantekin v. Univ. of

<u>Pittsburgh</u>, 192 F.3d 402, 415 (3d Cir. 1999) (declining to decide if materiality is an element of an FCA claim).[6] If the government would have paid the claims despite knowing that the contractor has failed to comply with certain regulations, then there is no false claim for purposes of the FCA.

This brings us to a related and significant distinction. Where a contractor participates in a certain government program in order to perform the services for which payments are eventually made—in this case, Medicare—courts are careful to distinguish between conditions of program <u>participation</u> and conditions of <u>payment</u>. <u>See</u> <u>United States ex rel. Gross v. AIDS Research Alliance-Chicago</u>, 415 F.3d 601, 604 (7th Cir. 2005) ("An FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements . . . requires that the certification of compliance be a condition of or prerequisite to

---

[6] Although we have not previously stated that the plaintiff must show materiality in FCA cases, <u>see</u> <u>Shaw</u>, 213 F.3d at 534, numerous courts have observed that certification analysis is essentially a way to determine whether compliance was material to the government's decision to pay. <u>See, e.g.</u>, <u>Hendrow</u>, 461 F.3d at 1173 (explaining false certification in terms of materiality); <u>United States ex rel. Landers v. Baptist Mem'l Health Care Corp.</u>, 525 F. Supp. 2d 972, 979 (W.D. Tenn. 2007); <u>United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.</u>, 238 F. Supp. 2d 258, 264 (D.D.C. 2002) ("The implied certification theory essentially requires a materiality analysis."). Although we now explicitly adopt a materiality requirement in the context of false certification claims, we do not address whether materiality is an element of the criminal false claims provision or under other theories of FCA liability. <u>See</u> <u>Medshares</u>, 400 F.3d at 444 n.12 (noting that "[w]ith regard to materiality, the language of the civil [FCA] provision is substantially different than its criminal counterpart").

government payment."); Mikes, 274 F.3d at 701-02 (discussing conditions of participation versus payment in an implied certification context). Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program. See Mikes, 274 F.3d at 701-02; 42 C.F.R. § 424.535(a)(1) (providing for revocation of Medicare bill privileges based on provider noncompliance). Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment.

A brief review of the scheme for managing Medicare participation will demonstrate that the annual cost report certification does not condition the government's payment on perfect compliance with all underlying statues and regulations, but rather seeks assurances that the provider continues to comply with the conditions of participation originally agreed upon. Reading the FCA otherwise would undermine the government's own administrative scheme for ensuring that hospitals remain in compliance and for bringing them back into compliance when they fall short of what the Medicare regulations and statutes require.

Before participating in the Medicare program, hospitals must undergo inspections, which may be conducted by private accreditation organizations. See 42 C.F.R. § 488.5(a). They must also complete a Medicare Participation

Certification, which includes a representation that the provider has complied with all applicable laws and regulations.[7]  After the organization is accredited, the government may at any time initiate a "validation survey," which may be conducted by a state agency, § 488.10(c), that ensures ongoing compliance with Medicare conditions.  § 488.7.  These surveys may be initiated on a "representative sample basis," or in the case of specific suspected violations, such as those Conner alleges here, "in response to "substantial allegations of noncompliance."  § 488.7(a).  A provider's ultimate compliance with a particular requirement or condition of participation "depends upon the manner and degree to which the provider or supplier satisfies the various standards within each condition."  § 488.26(b).

Even if, as the result of the survey, a provider appears noncompliant, the government does not immediately suspend Medicare enrollment or billing privileges.  Rather, the relevant regulations permit the provider to create a plan of correction, and allow a reasonable period of time—usually 60 days—to address any deficiencies.  See § 488.28(a), (c) & (d).  These procedures grant "[a]ll

---

[7] For the first time on appeal, Conner maintains that this certification, contained in "Form 855A," creates FCA liability based on a theory of promissory fraud.  "[W]e have repeatedly declined to allow parties to assert for the first time on appeal legal theories not raised before the district court, even when they fall under the same general rubric as an argument presented to the district court," United States v. A.B., 529 F.3d 1275, 1280 n.4 (10th Cir. 2008), and we again decline to do so here.

providers and suppliers . . . an opportunity to correct the deficient compliance . . . before a final determination to revoke billing privileges." § 424.535(a)(1). Only after finding that the provider has not "substantially" complied may the government, at its discretion, terminate a Medicare participation agreement. 42 U.S.C. § 1395cc(b)(2); see also Evelyn v. Kings County Hosp. Ctr., 956 F. Supp. 288, 292 (E.D.N.Y. 1997). And even in those cases, Conner cites no regulations or case law indicating that the government normally seeks retroactive recovery of Medicare payments for services actually performed on the basis that the noncompliance rendered them fraudulent.

It follows that the certification in the annual cost report represents the provider's assurance that it continues to comply with the requirements of Medicare participation. Implied in this certification is the recognition that the provider could face consequences through the administrative procedures described above if it falls short of substantial compliance. Based on the fact that the government has established a detailed administrative mechanism for managing Medicare participation, we are compelled to conclude that although the government considers substantial compliance a condition of ongoing Medicare participation, it does not require perfect compliance as an absolute condition to receiving Medicare payments for services rendered.

By contrast, consider if Conner's view of the certification were correct. An individual private litigant, ostensibly acting on behalf of the United States, could

prevent the government from proceeding deliberately through the carefully crafted remedial process and could demand damages far in excess of the entire value of Medicare services performed by a hospital. If successful, the consequences of such an action would likely be catastrophic for hospitals that provide medical services to the financially disadvantaged and the elderly. See Evelyn, 956 F. Supp. at 292 (noting the parties' agreement that defendant's termination from the Medicare program "would effectively shut down a public hospital since it could not operate without federal funds"). Further, rather than relying on the experience of state agencies to survey compliance, such a broad reading of the FCA and the certification would burden the federal courts with deciding whether medical services were performed in full compliance with a host of Medicare statutes and regulations. As the Second Circuit has cautioned, "courts are not the best forum to resolve medical issues concerning levels of care." Mikes, 274 F.3d at 700. It is therefore with good reason that the agencies of the federal government, rather than the courts, manage Medicare participation in the first instance in cooperation with the states and accreditation organizations. See id. ("[P]ermitting qui tam plaintiffs to assert that defendants' quality of care failed to meet medical standards would promote federalization of medical malpractice, as the federal government or the qui tam relator would replace the aggrieved patient as plaintiff."). And when an individual plaintiff is harmed, state tort law remains a powerful incentive for hospital to provide quality care. There is thus no basis in

-19-

either law or logic to adopt an express false certification theory that turns every violation of a Medicare regulation into the subject of an FCA qui tam suit.

Although we are the first circuit to squarely reject Conner's sweeping annual cost report false certification theory, other courts have reached similar holdings that support our conclusion. Perhaps most on point is Hopper. There, a relator sued a school district under the FCA, claiming that it had violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., with respect to its handling of special education students. Hopper, 91 F.3d at 1263. The relator alleged that, among other things, the district had submitted a triennial certificate stating that it would "'meet all applicable requirements of state and federal law and regulations,' including 'general compliance' with the IDEA." Id. at 1265. This certification, she argued, made all claims for government special education funding false because the district had, in fact, failed to meet the requirements imposed by IDEA regulations. Id. The court disagreed, holding that there was no "false claim" under the FCA. Id. at 1267. In reasoning that "[m]ere regulatory violations do not give rise to a viable FCA action," the Ninth Circuit was careful to observe that there were "administrative and other remedies for regulatory violations." Id. Because the government's payment was not itself conditioned on the certification, the court recognized that the FCA was not an appropriate avenue for the relator to pursue a cause of action based in allegations of regulatory noncompliance. Id.

-20-

This reasoning applies equally to Conner's broad proposition that, by virtue of the cost report certification, Medicare payments are expressly conditioned on perfect ongoing compliance with all regulations at all times. Nevertheless, as other courts have recognized, some regulations or statutes may be so integral to the government's payment decision as to make any divide between conditions of participation and conditions of payment a "distinction without a difference." Hendrow, 461 F.3d at 1177. In Hendrow, which provides a telling contrast to the present case, a relator filed an FCA action against a university, alleging that it falsely promised to comply with Title IV's ban on "incentive compensation" simply to become eligible for Title IV federal funds. 461 F.3d at 1168-69. The court held that the incentive compensation ban was material to the government's payment decision. It observed that, in the absence of FCA liability, "the University would be virtually unfettered in its ability to receive funds from the government while flouting the law." Id. at 1176. It was careful, however, to "completely distinguish[]" this scenario from the Medicare context, where relevant regulatory compliance is "ensured by peer review and extensive monitoring." Id. at 1177.

Moreover, unlike Hendrow, not only is it far from clear that the government intended the cost report certification to condition payment on full regulatory compliance, but the government has also created a complex monitoring and remedial scheme that ends Medicare payments only as a last resort. It would thus

-21-

be curious to read the FCA, a statute intended to protect the government's fiscal interests, to undermine the government's own regulatory procedures. We therefore emphasize that our resolution of this case does not preclude the possibility that certain Medicare statutes or regulations might expressly or implicitly condition payment on certification of compliance under a false certification theory.

Conner relies heavily on United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F. Supp. 2d 1017 (S.D. Tex. 1998), where a district court held that compliance with the Anti-kickback statute was a condition of payment, and that violations of that statute rendered the certification in the annual cost report false. Id. at 1047. Conner would have us read Thompson more expansively to support his broader proposition. Even if we were inclined to adopt the Thompson court's narrow holding regarding express certification and the Anti-kickback statute, however, it would not lend any weight to the argument advanced in this case. That court's reasoning extended only to violations of the Anti-kickback statute, and not the broader theory that a cost report certification could expressly condition all Medicare payments on compliance with the full host of technical Medicare requirements, including quality of care standards. Id. at 1046-47.[8]

_____

[8] Because, as we will explain, Conner's Anti-kickback statute claims fail
(continued...)

-22-

The other cases cited by Conner generally involve classic fraud scenarios and do not support his broad theory. For example, United States ex rel. Augustine v. Century Health Services, Inc., 136 F. Supp. 2d 876 (M.D. Tenn. 2000), involved an FCA claim alleging that a health provider had billed Medicare for certain employee stock ownership plan contributions for which it was not entitled to reimbursement. Id. at 878. The issue in Augustine was simply whether certain expenses, for which the provider sought reimbursement, were actually allowable costs under Medicare. Id. at 887. In such a case, where the validity of actual costs is at issue, there can be little question that had the government known of the alleged fraud, it would not have made the payments. See also In re Cardiac Devices Qui Tam Litigation, 221 F.R.D. 318, 346-47 (D. Conn. 2004) ("To the extent that defendants included in their Cost Reports payments for non-covered items, this would render their certifications false. . . .

---

[8](...continued)
for other reasons, we do not decide whether we would adopt the Thompson court's reasoning. We note, however, that several other courts have followed Thompson's reasoning and reached similar conclusions. See, e.g., United States ex rel. McNutt v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1260 (11th Cir. 2005) (holding that violations of the Anti-kickback statute are actionable as false statements under the FCA); United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 243 (3d Cir. 2004) (same); United States v. Rogan, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006) ("Falsely certifying compliance with the Anti-kickback Statute in a Medicare cost report is actionable under the FCA." (citations omitted)); United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 28, 32 (D.D.C. 2003); United States ex rel. Kneepkins v. Gambro Healthcare, Inc., 115 F. Supp. 2d 35, 43 (D. Mass. 2000).

To hold otherwise would give defendants free reign to submit claims for any and all types of non-covered services.").

## B

Conner also asserts that SRHC violated the FCA by submitting claims while failing to comply with the Anti-kickback statute. We need not decide whether violations of the Anti-kickback statute are actionable through the FCA, see Thompson, 20 F. Supp. 2d at 1047, because Conner has not alleged a kickback within the meaning of the Anti-kickback statute.[9]

The Anti-kickback statute forbids "any remuneration knowingly and willfully offered, paid, solicited, or received in exchange for Medicare or Medicaid patient referrals." United States v. LaHue, 261 F.3d 993, 996 (10th Cir. 2001); see also 42 U.S.C. § 1320a-7b(b)(1)(A). Its prohibition applies both to kickbacks offered as cash and those provided "in kind." § 1320a-7b(b)(1). Conner alleges that SRHC violated the statute by "forc[ing]" him to provide scrub staff at his own expense, in exchange for the receipt of hospital privileges and the attendant lucrative right to receive Medicare referrals.

A careful reading of Conner's complaint reveals that he has not stated an actionable claim under the FCA based on the Anti-kickback statute. Conner and

---

[9] As noted, SRHC has not contested as a legal matter Conner's assertion that a violation of the Anti-kickback statute could serve as a predicate for FCA liability.

-24-

SRHC disagreed regarding whether SRHC had hired qualified scrub staff trained to assist in "more difficult or specialized surgeries." (Compl. ¶ 47). As Conner's issues with the scrub staff became a barrier to his reappointment, SRHC proposed a compromise: If Conner did not like the scrub staff the hospital provided, he could provide his own. Even Conner admits that he was not required to furnish scrub staff at his own expense, but rather that the hospital allowed him to "furnish scrub personnel . . . or else passively accept whatever persons and facility provisions that SRHC chose to provide his surgery patients." (Compl. ¶ 53). In fact, SRHC did not even require Conner to choose between accepting the hospital's staff or providing his own; rather, it explicitly offered to provide additional training to scrub staff with Conner's assistance.

Such a proposal does not resemble an illegal kickback arrangement and belies any allegation of willful and knowing intent. It may be true that a devious Medicare provider could create a kickback scheme in which it avoided hiring scrub staff and thus falsely profited at the government's expense by forcing doctors to provide their own staff in return for privileges and referrals. But, Conner's allegations depart from this hypothetical scheme in two significant ways. First, there is no suggestion in the complaint that SRHC ever refused, or threatened to refuse, to provide scrub staff. SRHC provided scrub staff, and Conner simply disapproved of them. Thus, the only issue was Conner's opinion that the hospital's scrub staff fell below the requirements of Medicare

-25-

participation. If Conner was correct, SRHC would be subject to the usual consequences for violating Medicare regulations, including ultimately a possible loss of accreditation or termination of its Medicare participation agreement. His refusal to use this allegedly sub-par staff and SRHC's attempt to accommodate this refusal, however, does not amount to a kickback.

Second, SRHC's letters to Conner discuss conditions under which Conner's appointment would be renewed. They do not, in any way, address his ability to receive Medicare referrals. Although it is true that the hospital would presumably not refer Medicare patients to Conner if he was not reappointed to the hospital's staff, this was merely a collateral consequence of a decision that, fundamentally, involved Conner's underlying right to associate with SHRC. The hospital's decision not to reappoint Conner prevented him from operating on <u>any</u> patient at SRHC, not just Medicare patients referred by the hospital or another doctor. It applied equally to a patient paying out of pocket or with private insurance. Conner's dispute with SRHC thus involved only his underlying appointment on the hospital's medical staff, and not his right to receive Medicare referrals. SRHC's attempt to broker a private compromise with an independent physician who was dissatisfied with the hospital's accommodations is not a solicitation for a kickback within the meaning of the statute. The district court therefore properly dismissed this count for failure to state a claim.

**III**

SRHC cross-appeals the district court's ruling that Conner's state law claims were not barred by the applicable statutes of limitations.[10]  When determining whether state law claims are timely commenced, we look to state law.  Burham v. Humphrey Hospitality Reit Trust, Inc., 403 F.3d 709, 712 (10th Cir. 2005).  Our review of the district court's application of the state statute of limitations is de novo.  Bass v. Potter, 522 F.3d 1098, 1102 (10th Cir. 2008).

The parties agree that Conner's state law claims accrued at the latest on October 17, 1997, when the SRHC Board of Trustees affirmed the decision to deny Conner's application for reappointment.  Conner filed a state lawsuit that included these claims within the relevant limitations period, but voluntarily dismissed the state case on February 12, 2004.  Because the state case was dismissed "otherwise than upon the merits," Kansas law allowed Conner six months to commence a new action which included those claims.  See Kan. Stat. Ann. § 60-518.  This means that Conner's claims survive only if he commenced this action by August 12, 2004.

For purposes of Kansas's statutes of limitations, an action is "commenced"

---

[10] Despite this conclusion, the district court declined to exercise supplemental jurisdiction over these claims and later dismissed them without prejudice.  Under the circumstances, SRHC has standing to appeal the dismissal on the merits because a holding in its favor would likely prevent Conner from refiling these claims in state court.  Amazon, Inc. v. Dirt Camp, Inc., 273 F.3d 1271, 1275-76 (10th Cir. 2001).

-27-

on the date a complaint is filed, but <u>only if</u> the plaintiff serves the complaint within 90 days of filing. § 60-203(a)(1). In the event the party fails to make service within 90 days, the action is commenced on the day that service is actually effected. § 60-203(a)(2). In this case, Conner filed his First Amended Complaint on June 1, 2001, but did not add the challenged state law claims until his Third Amended Complaint, which was filed on June 16, 2004. He did not serve SRHC with that complaint until September 21, 2004, 97 days after he filed that complaint and over three years after he filed the First Amended Complaint. Under a straightforward application of Kansas law, Conner's state law claims are untimely because the action was not commenced until service on September 21, 2004, which was more than a month after the six-month refiling period had run.

Nevertheless, the district court concluded that Federal Rule of Civil Procedure 15(c)(1)(B) obviates the need for timely notice under Kansas law when a claim is added in an <u>amended</u> complaint. Rule 15(c)(1)(B) provides:

> An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . . .

Applying Rule 15(c), the district court concluded that Conner's Third Amended Complaint "related back" to the original complaint filed on June 1, 2001, because it arose out of the same conduct alleged in Conner's original federal pleading, and consequently ruled that the state law claims were timely.

We cannot agree.  It may well be that the amended complaint related back under Rule 15(c), but this has nothing to do with the timely service requirement of Kansas's statute of limitations.  Federal courts apply state rules concerning statutes of limitations because such statues embody "a substantive decision by that State that actual service on, and accordingly actual notice by, the defendant is an integral part of the several policies served by the statute of limitations." Walker v. Armco Steel Corp., 446 U.S. 740, 751 (1980); see also Hanna v. Plumer, 380 U.S. 460, 463 n.1 (1965) (holding that a federal rule governing the means of service trumped a state rule, noting that the federal rule, like the state rule, aimed to provide actual notice to a defendant).

Only where there is a direct conflict between a federal and state rule must the federal rule prevail.  Walker, 446 U.S. at 744.  Here, this is no conflict; Rule 15(b) governs relation-back of pleadings, and the Kansas rule creates an actual notice requirement for statute of limitations purposes.  Notably, Kansas has its own relation-back rule, Kan. Stat. Ann. § 60-215(c), which we have recognized as "essentially identical" to Rule 15(c).  Prime Care of Ne. Kan., LLC v. Humana Ins. Co., 447 F.3d 1284, 1289 n.6 (10th Cir. 2006).  Kansas applies this rule in conjunction with, not instead of, § 60-203(c)'s service requirement.  See Housh v. Hay, 128 P.3d 409, 411 (Kan. Ct. App. 2006).  In Housh, the court held that when a time-barred amended complaint related back to a timely initial complaint, § 60-203(a)(1) required the plaintiff to make service of the amended complaint within

-29-

90 days of the original timely complaint.  Id.  If Kansas construes its version of Rule 15(c) as consistent with § 60-203(c), then we must adhere to that construction.[11]

Rule 15(b) determines when amended pleadings "relate back" to the original pleading; it does not change the conditions under which an action is "commenced" for the purposes of the state statute of limitations.  The federal rule does not preempt § 60-203(a), and § 60-203(a) plainly requires timely service or actual notice to a defendant.  Thus, regardless of whether Rule 15(c) applies, the unavoidable fact remains that Conner did not serve SRHC within 90 days of either the First or Third Amended Complaints.  His state law claims are barred by the statute of limitations because the refiling period had run when he first served SRHC.  Consequently, the district court should have dismissed the pendant claims with prejudice.[12]

**IV**

---

[11] It would also be a curious result if a plaintiff in a federal action could avoid serving a defendant with notice of a complaint until years after the limitations period ended, but be barred from proceeding in a state case with an identical procedural history.

[12] In an alternative argument, Conner maintains that because qui tam FCA cases must be filed under seal, the statute of limitations should have been tolled until the district court unsealed Conner's complaint.  See 31 U.S.C. § 3730(b)(2) (requiring a qui tam plaintiff to file FCA complaint in camera, and prohibiting service on the defendant until the court so orders).  But this argument was neither presented to, nor ruled on by, the district court, and we will not consider it on appeal.  Meyerhoff v. Michelin Tire Corp., 70 F.3d 1175, 1182 (10th Cir. 1995).

For the reasons stated, we **AFFIRM** the district court's dismissal of Conner's FCA claims. We **VACATE** the dismissal of his state law claims without prejudice, however, and **REMAND** with instructions to dismiss those claims with prejudice.